UNITED STATES OF AMERICA
EASTERN DISTRICT OF MICHIGAN
SOUTHERN MICHIGAN

UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                  Case No. 10-CR-20312-01
                                          Hon. George Caram Steeh

ERIC LANGLOIS,

          Defendant.
_____/

**DEFENDANT ERIC LANGLOIS'S SENTENCING MEMORANDUM**

**"Its never to late to be what you might have been." George Elliot**

Eric Langlois will appear before the Court for sentencing on November 18, 2010, having pled guilty to Conspiracy to Possess with the Intent to Distribute and to Distribute MDMA (ecstasy) under a Rule 11 Plea Agreement. The Rule 11 plea agreement calls for a guideline range of 37-46 months. Under the terms of the plea, Mr. Langlois's sentence may not exceed 46 months. The probation department has agreed with the parties guideline range.

Based on Mr.Langlois's truly extraordinary effort at self rehabilitation, as more fully explained below, counsel respectfully urges your Honor to impose a sentence that will permit defendant to continue with his present employment so that he can provide for his fiance and his three young children.

The factors set forth in 18 U.S.C. § 3553(a) that a guide a judge in determining the appropriate sentence since the Supreme Court's landmark decision in *United States v. Booker,* 543 U.S. 220 (2005) are certainly well known to your Honor, as is the requirement that the Court "impose a sentence sufficient, but not greater than necessary, to comply with" those purposes.

Familiar, too, is the Supreme Court's admonition in *Gall v. United States*, 522 U.S. 38 (2007), that in applying these factors, a sentencing judge "must make an individualized assessment based on the facts presented" by the case, and without giving presumptive weight to the Sentencing Guidelines.

Although the promulgation of the guidelines was an attempt by Congress to promote uniformity in sentencing, *Booker* and its progeny as well as the factors set forth in 18 U.S.C. § 3553(a) make clear that sentencing involves more than a formulaic response to crime and punishment and require the sentencing court to consider offender characteristics that go beyond the simple issue of criminal history, the only guideline factor that speaks to the offender. Indeed, in *United States v. Gall*, 522 U.S. 38, 128 S.Ct. 586, 596 (2007), the Supreme Court specifically stated that a formulaic approach to sentencing is inappropriate:

> On the other side of the equation, the mathematical approach assumes the existence of some ascertainable method of assigning percentages to various justifications. Does withdrawal from a conspiracy justify more or less than, say, a 30% reduction? Does it matter that the withdrawal occurred several years ago? Is it relevant that the withdrawal was motivated by a decision to discontinue the use of drugs and to lead a better life? What percentage, if any, should be assigned to evidence that a defendant poses no future threat to society, or to evidence that innocent third parties are dependent on him? The formula is a classic example of attempting to measure an inventory of apples by counting oranges.

The Supreme Court also made clear that in applying the § 3353(a) factors, a sentencing judge "must make an individualized assessment based on the facts presented" by the case, without giving presumptive weight to the Guidelines sentencing range:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not

>presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented.

*Id* at 596-597.

Such an approach which gives individualized consideration to *all* of the sentencing factors identified by the statute is not only commanded by the holding of *United States v. Booker,* 543 U.S. 220 (2005), but is logical as well, in view of the degree to which the Guidelines are driven principally by the nature of the offense conduct, and only minimally by the characteristics of the particular offender and his or her life and character. As the Supreme Court noted in *Gall,* quoting its earlier opinion in *Koon v. United States*, 518 U.S. 81, 113 (1996), "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id* at 598.

Mr. Dean of the United States Probation Department has prepared a presentence report and counsel sees no need to simply reiterate what is contained in the report. Nevertheless, undersigned counsel believes it appropriate to emphasize some of the information contained in the report and supplement it with some additional information.

Without question, Mr. Langlois violated the law. Thus, the question is not one of guilt or innocence but rather the question to be answered is what sentence is "sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)." Under § 3553(a) the court, in addition to the guideline range, should consider the following factors:

>(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>(2) the need for the sentence imposed--

3

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

* * *

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7) the need to provide restitution to any victims of the offense.[1]

## 1. **The nature and circumstances of the offense and the history and characteristics of the defendant**

Mr. Langlois's upbringing was not easy. A the time of Eric's birth, his father was married to another woman and remained married to the other woman until his death in 2000. While he did have contact with his father growing up it was sporadic. As his uncle Scott Lites, a partner a the law firm of Plunkett Cooney, writes, "Although prior to his death Eric had some involvement with his father, Eric did not grow up with him in his home every day. Except for when he spent time with my parents, Eric had a limited sense of "family" and did not grow up with a true male "role model.". Exhibit A.[2] It was after the death of his father that "Eric began to experiment with drugs and began hanging out with the wrong crowd." Letter from Scott Lites. Thus, when Eric was

---

[1] Restitution is not an issue in this case.

[2] A number of letters from family, friends, and business associates is attached hereto as Exhibit A, to assist the Court in forming a fuller understanding of Eric Langlois, and the way his life has evolved.

4

arrested in January of 2006, it did not come as a complete surprise. See letters from James and Scott Lites.

Mr. Langlois's participation in the conspiracy took place between November of 2005 and January 2006, almost exactly five years ago. After his arrest, Mr. Langlois began to comprehend the consequences of his life style and made decision to change the course of his life. He stated that he was willing to cooperate in the investigation and shortly after his arrest met Assistant United States Attorney Keith Corbett and the case agent and fully disclosed his role in the conspiracy in order to begin making amends for his conduct. As recognized by Judge Motley, in *United States v. Motley*, 807 F.Supp. 1063, 1067-168 (S.D. N. Y. 1992), "cooperation with the Government...signals a step forward in rehabilitation." [3]

More importantly, his change of attitude was not limited to his willingness to cooperate but included a complete change in lifestyle and attitude. Since his arrest, the changes that Mr. Langlois have brought upon himself are truly astonishing. It is not in any way hyperbole to say that the person who will appear before your Honor bears no resemblance, other than his physical appearance, to the person who was arrested in January of 2006. At the time of his arrest, Eric readily admits that he was an irresponsible teenager that failed to grasp the significance of his conduct and the self destructive nature of his lifestyle. He was using drugs on a regular basis and his drug use certainly skewed his judgment. Since his arrest and the birth of his children, however, he has stopped using

---

[3] Mr. Langlois, through counsel, has reaffirmed to Assistant United States Attorney Dawn Ison his willingness to cooperate. Ms. Ison, however, has informed counsel that because the case against the one co-conspirator who has not yet been charged is extremely strong, his cooperation is not needed and therefore, his earlier debriefing did not constitute "substantial assistance" within the meaning of U.S.S.G. § 5K1.1.

drugs of any kind and has completely disassociated himself from the drug culture and his former friends who are a part of that culture.

Jessica Beverly, his fiancé and the mother of his three children, describes how prior to the birth of his first child Eric was on a self destructive path but since his arrest and the birth of his son, Eric changed from an irresponsible teenager to a responsible parent who fully appreciates the profound responsibility that comes with raising children:

> Just before my oldest child was born, Eric was headed down a self-destructive path. Being a 19 year old kid with very little concern for everyday responsibilities. While he always worked hard, outside of work Eric was living the party life which was putting a tremendous strain on our relationship. I was becoming extremely nervous about being pregnant, what kind of life of my child be brought into. Is this how I wanted to live? Surely after Eric was arrested, I started to notice a difference in his attitude towards life in general. Our son was born April 19, 2006. I watched Eric turned from the irresponsible kid to a loving and caring father. Suddenly his actions were no longer selfish but had become about the well-being of his family. He realized what needed to be done to make sure that we had a solid future. We were struggling to make ends meet; he started taking extra shifts to produce extra income. Instead of out partying, his nights were spent at home with me and Damien. When we found out we were expecting twins Eric worked very hard to get his promotion to become a heavy equipment operator, so he would have a promising career instead of an everyday job. Due to the economy I lost my job two years ago, Eric has become the sole provider for the family once again stepped up with whatever extra hours he could get to make up the lost funds.
>
> * * *
>
> I have watched him turn from a kid to a man, irresponsible to responsible, and most importantly become a great father.

His supervisor at work, Dave Seegert, with whom Eric is extremely close, also talks about Eric's strong work ethic and the radical changes Eric made in his life after being arrested:

> Eric was born out of wedlock and his father was married to another woman. He was basically raised by his mother with whom he is very close. Although his father did keep in contact with Eric, his father died when Eric was young. Over the years, Eric and I have developed a sort of father/son relationship.

6

> When Eric was arrested in January of 2006 for selling drugs, he immediately came to me and told me what happened. I sat Eric down and told him that everyone has choices in life and that he continued to make choices that involve using and selling drugs, he would find himself in prison one day. He asked me not to fire him and said that he would prove to me that he learned his lesson. I decided to give him a second chance because of the strong work ethic he displayed in the past. Eric did not disappoint me. As hard as he worked before, he seemed to double his efforts. In 2008, a position in the company opened up for a heavy equipment operator. Although Eric did not have any experience as a heavy equipment operator, I felt he'd earned the right to try to better himself. My trust was not misplaced he was promoted and now earns $21 per hour and works between 45 and 50 hours per week.
>
> More importantly, Eric has shown incredible maturity. He now has three young children, a four-year-old and a set of twins that are two years old. He has shown the same dedication to his family that he has shown in the workplace. His life revolves around his family and as a young father he has demonstrated a maturity beyond his years.

His uncle James Lites echoes the sentiments of Eric's fiancé and his supervisor at work:

> Since his arrest, my youngest brother, Scott Lites and I have taken responsibility for helping Eric and his mother through this difficult time. I have met with Eric personally and have observed him closely since his arrest. He seems sincerely, and dramatically, different than he was five years ago. He has dedicated himself to his wife and three children and the importance of that family responsibility. He has worked hard to support his family and my understanding is that he has risen to a position of significant responsibility with his employer. Every indication is that he has turned his life around since his arrest. My observation from speaking with him, his mother, his grandparents and other relatives is that he has turned his back on those influences that were there immediately after he graduated from high school.

His uncle Scott Lites also writes of Eric's self rehabilitation, particularly pointing out how

seriously he takes his familial responsibilities:

> Since Eric's arrest, whether due to [his arrest], his involvement with his fiance and the mother of his three children, Jessica Beverly, and the birth of his three children, he has become a completely different and, <u>in all respects</u>, a better person. I have monitored his employment situation through both his mother and his immediate supervisor and it is my understanding that he is an extremely valuable employee earning $21.00 per hour. . .In addition, he is also a wonderful father to his three children (all under the age of six) and common law husband. To watch him interact with his twin daughters and his 5 year old son is a pleasure. He is extremely attentive to their needs and those of Jessica.(Emphasis in the original).

7

His mother Lori Lites candidly writes that prior to his arrest and the birth of his children, she was extremely disappointed with Eric's life choices but that since his arrest and the birth of his children she could not be more proud of him:

> I want to tell you about my son, Eric Langlois, specifically the young man he has become. As a parent, I admit that I was truly mortified and disappointed in some of the choices Eric made. He has, however, matured from a self absorbed, somewhat immature 19-year-old to a truly thoughtful and kind 24-year-old father of three. Eric has worked to turn his life around in the years since his arrest I see changes in him that are truly admirable.
>
> * * *
>
> He takes his role as a parent very seriously, he is a gentle and loving parent who spends his free time with his family. He has embraced the responsibility that comes with parenthood and his a truly gentle and loving father.
>
> Eric has worked hard to improve his earning potential and support his family. I am proud of the work ethic he has demonstrated and the promotions he has earned through hard work and dedication. He is well-liked by his supervisors and co-workers at Carleton Farms and I've been told that he is a valued employee. His boss once commented that Eric comes to work every day ready to work, he does whatever job he is assigned, he never complains and always stays when asked to work late, all attributes that are highly valued by his boss.
>
> Although Eric made some very poor choices several years ago I believe that he has matured and changed, and is truly a different person than he was when he was arrested.

Former Macomb County prosecuting attorney, Carl Marlinga, a family friend, also describes the transformation Eric has undergone since the birth of his children:

> Eric tells me he is facing sentencing on drug charges. He explained that the charges stem from events in January 2006. Evidently the charges were languishing for quite some time before the US attorney's office made the decision to go forward. He also told me that since then, he has experienced the life-changing events which guarantee that he will never go back to his old ways. And I believe him.
>
> Specifically, Eric and his fiancée Jessica, had their first child, Damien in April of 2005. Since then they have added twins, Jordyn and Jaelen, who are now two years of age. Their marriage plans are on hold since what happens in the upcoming sentence will greatly determine the direction that their lives take. Eric says that his whole life can be divided to the time before children in the time after children.

> Before he was a father, he thought only of himself and the most selfish and short-term way of thinking. His involvement in drugs brought him money and, more importantly, status in the eyes of his friends. Now that he has a family he has discovered real meaning in real status. It is hard for him to even recognize how shallow and stupid he was only a few short years ago. His life was devoted to his children. His greatest satisfaction in life that was keeping his family safe and happy.

Mr. Marlinga also describes how Eric is the sole support of his three young children and his fiancée:

> Eric has also advanced in his employment in the intervening years. He is . . . employed as an equipment operator for Republic services in new Boston, Michigan. . . Eric is the sole support of his family. Jessica, his future wife, was in a serious automobile accident in Wisconsin in January 2008. She has not been able to work since then.

The above excerpts from the attached letters as well as the other letters that are attached, collectively as Exhibit A, leave no doubt that Eric Langlois has learned from his past misdeeds and has abandoned the lifestyle which led him to the predicament which brings him before your Honor. While the offense is undeniably a very serious one, it is equally undeniable that Eric fully understands this fact.

Even before *Booker* the law recognized that extraordinary post-offense rehabilitation might form the basis for a below-Guidelines sentence, while placing the kind of rigorous limitations on a sentencing court's discretion which were swept away by the Supreme Court's decision in that case. *See, e.g., United States v. Brock*, 108 F.3d 31, 34 (4 th Cir.1997); *United States v. Sally,* 116 F.3d 76, 79 (3d Cir.1997); *United States v. Core,* 125 F.3d 74, 78 (2d Cir.1997); *United States v. Kapitzke,* 130 F.3d 820, 823 (8 th Cir.1997); *United States v.. Rhodes,* 145 F.3d 1375, 1383 (D.C.Cir.1998); *United States v. Jones,* 158 F.3d 492, 502-03 (10 th Cir.1998), all cited in *United States v. Blake,* 182 F.3d 918 (6th Cir. 1999) (unpublished). In *Gall*, however, the Supreme Court made clear that a defendant's post-offense rehabilitation can be the basis for a variance far below the guideline range, including a sentence of straight probation. In *Gall*, the defendant, a college

student, was indicted for conspiracy to distribute ecstasy. At the time Mr. Gall joined the conspiracy, he was a regular user of ecstasy, cocaine, and marijuana. His participation in the conspiracy netted him approximately $30,000, a sum greater than what Mr. Langlois netted in the instant conspiracy. After Mr. Gall left the conspiracy, he stopped selling drugs altogether and also stopped using ecstasy. Mr. Gall graduated college, moved to Arizona. and secured employment. He later moved to Colorado where he became a master carpenter earning $16.00 per hour. He also stopped using drugs altogether after graduating from college. Mr. Gall was indicted in the Southern District of Iowa three and a half years after his involvement in the conspiracy ended. After his indictment, Mr. Gall moved back to Iowa where he started his own business. As in the case at bar, Mr. Gall had no prior convictions. In addition as in the case at bar, Mr. Gall met with the agents and agreed to cooperate but he was unable to provide any new information that would meet the threshold of providing substantial assistance. Also, as in the case at bar, the sentencing court received letters from people in the community praising his work ethic and character. Although the government did not dispute that Mr. Gall had led a law abiding life since he left the conspiracy, it, nevertheless, argued that a sentence within the guideline was appropriate and should be followed. The sentencing court, however, citing Mr. Gall's post-offense conduct, the support of his family and friends, his lack of criminal history, his work ethic, and his young age at the time of the offense, sentenced Mr. Gall to probation. In finding probation to be an appropriate disposition, the sentencing court stated as follows:

> "Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court

> or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life."

582 US at 44-45.

The sentencing court also noted that a term or probation amounted to a "substantial restriction on freedom."

> "[Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term."

*Id* at 44.

The government appealed the sentence and the Court of Appeals reversed and remanded for resentencing finding that the sentence constituted an unwarranted sentencing disparity and an abuse of the sentencing court's discretion . Mr. Gall appealed and the Supreme Court upheld the sentence holding that the sentencing court acted well within its discretion in sentencing Mr. Gall to 36 months probation. In so finding the Supreme Court specifically pointed to Mr. Gall's post offense conduct:

> Given the dramatic contrast between Gall's behavior before he joined the conspiracy and his conduct after withdrawing, it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future. Indeed, his consideration of that factor finds support in our cases. See,e.g., *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (holding that a jury was free to consider a 19-year-old defendant's youth when determining whether there was a probability that he would continue to commit violent acts in the future and stating that " 'youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage' " (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982))).
>
> \* \* \*
>
> The District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by,

11

>any court, but on his own initiative. This also lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts. See > 18 U.S.C. §§ 3553(a)(2)(B), (C).

Mr. Langlois's post arrest conduct essentially mirrors that of Mr. Gall.

**2. The "need for the sentence" to comport with the traditional purposes of punishment.**[4]

    A. Retribution.  The first of the statutory factors - that the sentence imposed should "reflect the seriousness of the offense, . . .promote respect for the law, and . . .provide just punishment for the offense," echoes the traditional concept of "retribution." Such measurements are of course difficult to draw with precision, and, as an advocate, it is difficult for counsel to maintain objectivity.  However, while Eric's offense is undoubtedly a serious one, as previously noted, it has been five years since he committed the offense and he led an exemplary life for the past five years. For all intents and purposes, Eric has been on sort of *de facto* probation since his arrest and has not in any way violated the law. Moreover, as the sentencing court in *Gall* pointed out a sentence of probation, a sentence of probation, particularly when coupled with home detention or confinement in a corrections center involves a "substantial restriction on freedom."

    B.  Deterrence - General and Special.  The two species of deterrence call for two kinds of analysis. As for general deterrence - the need to fashion a punishment which will deter the public at large from taking the same course of action as did the defendant - it seems reasonable to conclude that a sentence which results in a felony conviction , a period of probation coupled with a lengthy period of home confinement or alternatively, confinement in a community corrections center would

---

[4] The "traditional purposes of punishment . . . include retribution, rehabilitation, prevention of further crimes by the defendant, and deterrence of the defendant and others who might contemplate committing similar crimes. *Hobbs v. County of Westchester,* 397 F.3d 133, 158 (2d Cir. 2005) (citing 1 W. LaFave, Substantive Criminal Law § 1.5(a)(2d ed.2003).

serve as a sufficient disincentive to others who might otherwise be tempted to engage in similar conduct.[5]

---

[5] Aggravating a defendant's sentence by resort to considerations of general deterrence also poses a number of legal, moral, and practical difficulties, as United States District Judge James S. Gwin, of the Northern District of Ohio, perceptively noted in his Sentencing Memorandum in *United States v. Robert G. Cole,* Docket No. 5:08-cr-00327:

> A more difficult calculation, however, is the punishment necessary to dissuade others from engaging in similar conduct. General deterrence uses a utilitarian calculation, subjecting defendants to longer periods of incarceration than retribution requires to "send a message" to other potential offenders. Inherent in this general deterrence calculation is a tension between individual dignity and societal good, begging the question: Is it ethical to impose a greater-than necessary punishment upon an individual criminal defendant to protect society at large?
>
> * * *
>
> [S]entencing principally seeks retribution -- the punishment that society exacts before permitting the offender to rejoin that society. If such retribution is obtained, does a fair society impose an additional punishment to use the offender as an example?  Kant did not agree with this notion, explaining that
>
>> Judicial Punishment can never be administered merely as a means for promoting another Good either with regard to the Criminal himself or to Civil Society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a Crime. For one man ought never to be dealt with merely as a means subservient to the purpose of another.
>
> * * *
>
> Apart from any philosophical difficulties, the general deterrence concept also suffers from potential economic inefficiencies. . .Imprisonment costs tax-payers roughly $2,100 per month. Moreover, society suffers other lost opportunity costs with imprisonment including foregone earnings, as well as an accompanying loss of tax revenue. With over 2.25 million Americans incarcerated and with the United States having the highest incarceration rate worldwide, does incarceration efficiently deter crime? Indeed, for some offenders, the additional cost associated with their imprisonment exceeds the benefit to society of deterring their crimes .

13

With respect to special deterrence - the need to dissuade the defendant himself from future illegal conduct - undersigned counsel respectfully suggests that a sentence of imprisonment would in no way further deter Mr. Langlois from engaging in illegal conduct. Given his exemplary conduct over the past five years, it seems quite clear that Eric has been adequately deterred simply by virtue of his arrest; any sentence that requires imprisonment will in no way act as a further deterrent.

C. Incapacitation. "The rationale for incapacitation is to allow society to 'protect itself from persons deemed dangerous because of their past criminal history.'" *Allen v. Woodford,* 395 F.3d 979, 1009 (9th Cir. 2004) (citing 1 W. LaFave & A. Scott, Substantive Criminal Law 38 § 1.5 (2003)). As stated above, there is simply no reason to believe that it is necessary to incarcerate Mr. Langlois in order to protect society.

D. Rehabilitation. As noted above, it seems quite clear that there Mr. Langlois has been rehabilitated and that there is virtually no chance that Mr. Langlois will engage in illegal conduct in the future. Thus, a sentence of imprisonment will in no way further the rehabilitative process. In fact, counsel believes that a sentence that will allow Mr. Langlois to continue with his employment and support his family would further ensure that Eric will remain a law abiding citizen. A sentence that allows him to continue to support and remain with his family will send a powerful message to Mr. Langlois that his hard work and heartfelt decision to change his life in a meaningful way is laudable and deserving of recognition and reward.[6]

---

[6] Counsel further suggests that not only would such a sentence send a powerful decision to Eric but others as well. As this Court is aware, it is certainly not unusual for charges to be brought months and even years after the criminal conduct occurs. By rewarding Mr. Langlois for his hard work and change of lifestyle, others that find themselves in a position similar to Mr. Langlois's may persuaded to follow a similar path.

14

It should also be noted that it would not appear that the Bureau of Prisons offer any programs that would be of benefit Mr. Langlois in obtaining future employment. He clearly has skills that make him employable and there are simply no programs that are offered by the Bureau of Prisons that would enhance his prospects for employment in the future.

### 3. The kinds of sentences available.

In the wake of *Booker*, the Court is free to impose any kind of sentence which it deems appropriate, including home confinement, confinement in a community corrections center, or a period probation, coupled with a lengthy period of home confinement or confinement in a community corrections center.

### 4. The need to avoid unwarranted sentencing disparity.

The key word here, of course, is *unwarranted*. *United States v. Newsom,* 428 F.3d 685, 689 (7th Cir. 2005) (" we begin with the observation that § 3553(a) does not ban all disparities; its concern is only with unwarranted disparities."). Undersigned counsel's research, has not disclosed any data that would provide a meaningful comparison of the sentence sought by Mr. Langlois-a sentence that does not involve imprisonment-with sentences imposed on similarly situated defendants. While the United States Sentencing Commission does make available sentences imposed for various offenses, the data relative to variances from the guidelines does not differentiate between the type of drug distributed, the offenders role in the offense, or the quantity involved. See http://www.ussc.gov/JUDPACK/2008/ and http://www.ussc.gov/sc_cases/USSC_2009_Quarter_Report_3rd.pdf. Nor does any of the data take into account, any individual offender characteristics such as post arrest conduct, employment and family responsibilities. Nevertheless, it seems as a matter of common sense that treating a defendant

15

more leniently who, after his arrest and the birth of his children, completely turns his life around would not constitute an unwarranted sentencing disparity. Indeed, in *Gall*, the Supreme Court rejected the government's argument that a probationary sentence of 36 months constituted an unwarranted disparity when balanced against the other § 3553(a) factors.

### Conclusion

The circumstances that are present are far from those that your Honor typically faces in a drug distribution case. Mr. Langlois has, without question, transformed his life. In the five years following his arrest, he has stopped using drugs altogether and has totally withdrawn from the drug culture. His strong work ethic earned him a promotion to a heavy equipment operator and he now earns $21.00 per hour. He is currently engaged with three young children and is the sole support of his children. The letters attached as Exhibit A paint the picture of a young man, who if not familiar with George Elliot's quote, recognized the advice that the quote imparts: "Its never to late to be what you might have been." Mr. Langlois laudable and extraordinary efforts since his arrest should not go unrecognized.

Based on the foregoing, undersigned counsel urges your Honor to impose a probationary sentence that includes a period of home confinement that this Court deems appropriate. Alternatively, it is requested that Mr. Langlois be sentenced to a period of probation coupled with confinement in a community corrections center for a period of time your Honor deems appropriate. Such a sentence is truly a sentence that is sufficient but not greater than necessary to achieve the purposes set out in 3353(a).

        Respectfully submitted,

        s/ Mark J. Kriger
        MARK J. KRIGER (P30298)
        645 Griswold, Suite 1717
        Detroit, MI 48226
        313-967-0100
        Email: mkriger@sbcglobal.net

Dated: November 12, 2010

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

          Respectfully submitted,

          s/ MARK J. KRIGER
          Mark J. Kriger (P30298)
          Attorney for Defendant Langlois
          645 Griswold, Suite 1717
          Detroit, MI 48226
          313-967-0100
          Email: mkriger@sbcglobal.net